Immanuel J. Herrmann
Daniel A. Frishberg
*Pro Se Customer-Appellees*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Bankruptcy Appeal |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.,*[1] | ) | Case No. 23-CV-03920-JHR |
|  | ) |  |
| Customer-Appellees. | ) |  |
|  | ) |  |
| _____ | ) |  |

## CUSTOMER-APPELLEES' MOTION TO DISMISS THIS APPEAL

Immanuel J. Herrmann and Daniel A. Frishberg, Celsius Network LLC, *et al.* customers and creditors ("**We**," the "**Movants,**" the "**Customer-Appellees**") hereby file this motion (the "**Motion**") to dismiss this appeal.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## <u>WE INCORPORATE THE UCC'S MOTION TO DISMISS IN ITS ENTIRETY AND LEND OUR STANDING TO THEIR ARGUMENTS</u>

We incorporate by reference all arguments contained in the UCC's *Motion to Dismiss this Appeal* in Case No. 23-CV-03920-JHR Dkt. 4 (attached as Exhibit A) as if fully set forth at length herein, even if later withdrawn or otherwise modified. In making the arguments the UCC does, we lend our direct standing to those arguments as customers who filed timely proofs of claim asserting non-contract claims against all debtor entities and as two of the Debtor's "bellwether claimants."[2]

While the Series B Preferred holders *purport* to argue on behalf of a imaginary and *non-existent* "silent majority" of customers who ostensibly want to litigate our own non-contract claims against the Debtors in the name of due process, the truth is, as the UCC has pointed out, appellants **do not** have third party standing to enforce the rights of other creditors of the Debtors, who did not object

---

[2] Bellwether claimants are the first claims to go be adjudicated in the case, which then sets a precedent for other claims. Under this process, we would litigate our claims against the Debtors (with the Debtors, the Series B Preferred Holders, and the UCC all participating), and the result of that litigation would set a precedent for other non-contract claims in these cases. A bellwether claims process is one way to resolve non-contract claims for customers, a piecemeal approach which the Series B Preferred Holders seemed to favor but that goes against the equities of bankruptcy because it would likely result in only the most sophisticated and/or litigious customers successfully asserting non-contract claims against non-LLC entities. Resolving our contract claims such as breach of contract is difficult enough. As we noted in the bankruptcy court, along with Rebecca Gallagher, who is now a class claimant, "we know **firsthand** that bringing non-contract claims–such as those for fraudulent inducement, fraudulent misrepresentation, the violation of consumer protection laws, and more, one customer at a time–was a daunting prospect." *See Response to the Motion of the Official Committee of Unsecured Creditors (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders* (Bkr. Dkt. No 2476) (Emphasis added.)

to the motion themselves but, in fact **_universally_** supported it. *In re Bernard L. Madoff Inv. Securities LLC*, 721 F.3d 54, 58 (2d Cir. 2013).

On the other hand, we have direct standing. As the UCC noted, those who do clearly and unequivocally have standing—customers such as ourselves—are 100% aligned that the Customer Class Claims process should move forward for non-contract claims. *Not a single customer* objected in court, but, in fact, a number of customers, including ourselves, supported the Class Claims process in Court. Which for a case with over 600,000 customers, and that has been hotly contested, is saying something. Some of us had feedback, which was incorporated. For example we filed a joinder to Ignat Tuganov's filing, and the UCC accommodated those requests. The Series B Preferred Holders **_do not_** have standing to speak on behalf of us, or similarly-situated customers.

## PRELIMINARY STATEMENT

We would like to make it crystal clear from the outset of this case that two individual customers—who are actual parties to the Terms of Use that the Series B Preferred Holders were **not** parties to but are seeking nonetheless to intervene in—who unequivocally have standing in this matter regardless of what arguments the Preferred will make about the standing of the Official Committee of Unsecured

Creditors, and who participated in this matter in the Bankruptcy Court and are parties to it, believe this appeal should be **DISMISSED** for the reasons stated by the UCC, the reasons in this letter, and other reasons we will mention in our response.

Overturning this order (or even hearing this appeal) will cause us irreparable harm as we outline below, it will not facilitate resolution of the litigation, will destroy the estate's remaining value, and, therefore, leave for interlocutory appeal should be **DENIED**. If this appeal is permitted to move forward—which, to be clear, we *strongly* oppose—we seek to ensure alternative relief which preserves the rights of customers such as ourselves to have full representation and due process in all matters averse to the Series B Preferred Holders. The "Bellwether Claims" process, without estate-paid counsel and/or an official committee, will not ensure such due process. The Series B Preferred Holders would love nothing more than to make customers litigate these matters "on our own," but we will not allow that to happen, and this Court should not either, as doing so would be a grave miscarriage of Justice.

We were selected as "bellwether claimants" by Celsius—meaning, without the Customer Class Claims process that the Series B Preferred Holders are trying

to overturn through this appeal—we are going to have to defend ***our own*** non-contract claims against Celsius Network Limited and other entities on an individual basis, which could lead to up thousands or tens of thousands individual claims being litigated. This would destroy the estates value, and likely bring the Court system to its knees with 600,000 customers (or else, let's be honest, many people wouldn't file a claim at all and lose out, and of those who do, few will preserve their rights and show up in Court. Let's be honest: Anything that is not a collective process will mean a ***summary*** process for most, meaning most will simply lose their claims.

As part of the Bellwether process our non-contract claims would be used, indirectly, as the basis for other creditors' claims.[3] Otherwise, at great cost and expense, the estate (using our recovery dollars) will need to appoint an independent, third-party fiduciary *in lieu* of the Committee of Unsecured Creditors to do the same litigation on a collective basis, or, if it is all via Bellwether claims such as ours, we will ask the estate to pay for our counsel during the "Bellwether Claims" process to have a fair fight, and for access to all discovery materials the

---

[3] See *Response to the Motion of the Official Committee of Unsecured Creditors (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders,* Bkr. Dkt. No. 2476 and *Joinder to Ignat Tuganov's Response–and Rebuttal to the Series B Preferred Holders' Objection–to the Motion of the Official Committee of Unsecured Creditors (i) For Authority to FIle a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (ii) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders,* Bkr. Dkt. No. 2482, in particular, pp.17-19 for a possible scheduling order for "Bellwether Claims." We also have asked, in our proposed cross-appeal, for the District Court to order alternative representation for us as one possible modification of Chief Judge Glenn's order.

Series B Preferred Holders have, and for enough time to litigate *pro se* without prejudice (likely, 2-3 months; no different from what the Series B Preferred Holders ask for major litigations they undertake in these cases).

While the Series B Preferred Holders may well like such a delay, it will not help the estate, to the contrary, it would *severely* harm the estate in the form of value destruction. And, once we litigate our individual claims, that is only step one: others would be on their own, to file *their* claims, and argue how they are similarly or differently situated from us and then have *their* day in court. From the information we have so far, we expect the Debtors will likely oppose estate-paid counsel for the Bellwether claims process, so this may cause another controversy for resolution for the Court or Chief Judge Glenn or even an emergency appeal[4] on due process grounds if we cannot resolve it in the Bankruptcy Court (the exact opposite of helping resolve the litigation.)

Either way, if this order is disturbed, retail customers like us will lose. No matter how good our case is, it is very hard to win against sophisticated counsel such as the ones who filed this frivolous interlocutory appeal.

---

[4] To be clear, we do not want to have to file an emergency appeal, and would only do so as a last resort if we have to, to protect our rights in having counsel while we go up against well-heeled hedge funds and financial institutions with *two* top law firms and the Debtors who are represented by Kirkland & Ellis.

Not only do we personally stand to potentially have to litigate on our own non-contract claims against Debtor affiliates aside from Celsius Network LLC if the Court disturbs this decision, but we may have to hire our own counsel (which we cannot afford to do), seek out *pro bono* counsel, spend hundreds of hours *without compensation* (otherwise risk letting everyone else down) litigating *pro se,* sit through depositions or other invasive discovery by the Preferred Series B in their attempts to defeat our claims, and a myriad of other things that would impact us financially and impact[5] our lives profoundly in other ways, if this decision is overturned and we have to go back to the bellwether claims process as the exclusive way to litigate non-contract claims.

These are some of the many reasons that we, the Debtors, and the UCC agreed to put the "bellwether claims" process on hold, while the Class Claims process that the Series B Preferred Holders are attempting to disturb via this appeal moves forward. We will also note that the Series B Preferred Holders had sought to intervene in the litigation related to the Bellwether claims process we were participating in before the Customer Class Claims process began.[6]

---

[5] In Mr. Frishberg's case, he is a full time student, and needs to study/take classes. This case has already impacted his studies, but being forced to partake in extensive litigation would constitute irreparable harm.
[6] We reserve all rights to object to the appropriateness of, and standing of, the Series B Preferred Holders to participate in bellwether litigation if it starts up again in some form in the future.

## INVITED ERROR DURING THE CUSTOMER *CONTRACT* CLAIMS LITIGATION PRECLUDES THE SERIES B PREFERRED HOLDERS FROM NOW OBJECTING TO THE UCC'S ABILITY TO REPRESENT CUSTOMERS IN THE CUSTOMER *CLASS* CLAIMS LITIGATION

The Series B Preferred Holders take the position in **this** appeal (of the Customer Class Claims litigation) that "the Committee cannot act on behalf of individual creditors" and that "the Committee is not and cannot be a class member."

However, during the briefing and hearing of the "**Customer *Contract* Claims**" litigation (which led to the *Order Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use*) [Bkr. Docket No. 2265] (the "**Customer Contract Claims Order**"), which is under separate appeal under Case Nos. 23-CV-03144 (S.D.N.Y. 2023) and 23-CV-02882 (S.D.N.Y. 2023)—the Series B Preferred Holders <u>actively participated in, invited, *and* encouraged litigation in which</u>, according to **their own arguments** in *this* appeal, customers, the actual parties to the terms of use—were not present.[7]

---

[7] The Series B Preferred Holders may try to claim customers had a meaningful opportunity to participate in the Customer Contract Claims process (aka the "Briefed Legal Isseue" process.) That is false. The order was never served on approximately 600,000 customers (the actual parties to the terms of use) in spite of Cheif Judge Glenn's order that it be served, as our proposed record on cross-appeal shows, and, there was only nine days notice over the holiday period in 2022 to file a brief; customers such as ourselves were unable to participate and this is the subject of a separate appeal, as noted, and a potential Motion under Federal Rule of Civil Procedure 60(b). The bottom line, however, is that the Series B Preferred Holders **expressly invited** a litigation process for customer contract claims where they knew, going into the litigation, that the Debtors, the UCC, and the Series B Preferred Holders would **likely** be the only participants. They encouraged it. The benefited from it. They **won** an earlier ruling based on that,

**Now, having <u>won</u> the litigation on *contract* claims *without* the direct presence of customers in the litigation, based upon *<u>their express invited error</u>* (where excluding customers was to their strategic benefit in the first instance), the Series B Preferred Holders seek to *suddenly* reverse course and months later <u>insist</u> that customers *<u>represent themselves</u>* in litigation around *non-contract* claims. They doth protest too much.**

The UCC, the Debtors, and the Series B Preferred Holders were *the only parties* who participated in the litigation on the Customer Contract Claims litigation, which led to the Customer Claims Decision that **favored** the Series B Preferred holders.[8] **<u>No *pro se* creditors participated. No *represented* individual customers participated. No *represented group* of customers participated. Nor was anyone appointed to represent the Customer class, or parties to the Terms of Use as a class</u>**. Virtually no parties with a particularized interest in the matter were served with the briefing schedule or informed of the Customer Contract Claims Issue.[9]

---

where they are now appellees (not appellants). But in this appeal, they seek to **expressly bar** the UCC from representing customers when it doesn't benefit them. They cannot have it both ways.

[8] As noted, that decision is being separately appealed.

[9] Affidavits of service for who was served (which was only a small fraction of customers), are included in our proposed *Designation and Questions* on cross-appeal. Notwithstanding who was (not) served, the Series B Preferred Holders cannot seriously contend that 9 days' notice on the docket, during the holidays, was a meaningful opportunity to participate in litigation that they had been planning **for months.**

When the Series B Holders agreed to a Briefing Schedule that required no customer representation—and agreed the only *required* parties were the UCC and the Debtors—they expressly failed to raise the arguments they are attempting to raise now. In fact, they argued the **exact** opposite because, *at that time*, a fast, streamlined, process—with less parties participating—would benefit ***them*** (but now, when they decided that it does not currently benefit *them* to have a speedy resolution, they reversed course).

In *expressly* supporting a briefing schedule where the only required participants were the Debtors, the UCC, and themselves, but no customers and no parties to the terms of use,[10] the Series B Preferred Holders stated that "Not only is the Briefing Schedule a critical element of a broader agreement between the Debtors and the Series B Preferred Holders resulting from months of negotiations, but it would also allow for an efficient and fair process for resolving the Briefed Legal Issue, which would enable these cases to move forward expeditiously ***while safeguarding all parties' due process rights***."[11] (Emphasis added.) In doing so, the Series B Preferred Holders *expressly* waived the issue of who can represent customers for this case back in December—including the Class Claims issue

---

[10] See *Series B Preferred Holders' Statement (A) in Support of Debtors' Motion Seeking Entry of an Order (I) Setting a Briefing Schedule and (II) Granting Related Relief and (B) in Response to the Committee's Objection*, Bkr. Dkt. No. 1631

[11] Ibid.

before this Court today. And they ***expressly*** stated that a process that only required

the participation of the Debtors, the UCC, and the Series B Preferred Holders ***but***

***no individual customers*** "safeguard[ed] all parties' due process rights."[12] Yet, they

now argue the opposite before this Court.

To the extent that the UCC cannot represent individual customers (or groups

thereof) with our consent, which we dispute, the Series B Preferred Holders'

failure to raise this issue in the Customer Contract Claims litigation was a strategic

***invited error***, plain and simple. Having gone to bat to expressly support—and to

urge the Court to ***expeditiously*** approve—a briefing schedule earlier in this case

where the only required parties to represent customers on an important matter

impacting customers' rights were the Debtors, the UCC, and the Series B Preferred

Holders, because at that time they believed that limiting the parties to the litigation

would benefit ***them,*** and having gone so far as to contend that such a process

upheld "due process"[13] for all parties ***then***, the invited error doctrine bars them

from ***now*** belatedly objecting to "the identity of the parties who will act as class

representatives" and otherwise represent customers. That is why, if they are

granted leave to appeal, we plan to cross-appeal and raise these critical issues.[14]

However, without the ability to object to this issue, their entire appeal falls apart

---

[12] Ibid.
[13] Ibid.
[14] See 23-cv-03920-JHR Dkt. No. 5, which has a copy of the cross-appeal filed in the Bankruptcy Court.

before it even begins. The bottom line? **This appeal should be DISMISSED**

**before it even begins**.

## ARGUMENT

**The Invited Error Doctrine Bars the Series B Preferred Holders from Contesting the UCC's Ability to Represent Customers**

The Series B Preferred Holders **invited error** by proposing/negotiating a briefing schedule that gave customers **no meaningful opportunity to participate** in the litigation over **which entities customers had contract claims against**.[15] Under the **invited error doctrine**, appellate courts are "especially reluctant" to provide relief on the basis of procedural errors that a defendant **himself** invited or provoked the [court] to commit. *United States v. Gomez*, 705 F.3d 68, 75 (2d Cir.2013) (internal quotation marks omitted); *see* also *United States v. Wellington*, 417 F.3d 284, 290 (2d Cir.2005) ("[D]efendant cannot complain of an error that he himself invited…").

---

[15] The Series B Preferred Holders likely **thought** that notice would be given to Customers, within 1-2 days of the entry of the briefing scheduling on December 19, 2022. Briefs were due on December 28, 2022. Even if notice had been given (which it was not, due to an error on the part of the Debtors), the Series B Preferred Holders still supported the entry of an order where customers would have, at most, only 7-8 days to write a full brief, over the holidays, at best. That is not notice and a meaningful opportunity by the Series B Preferred holders' standard. They would, in fact, "cry bloody murder" if the Court approved such a briefing schedule where their client's interests were on the line. But apparently, such a schedule was good enough for customers who don't deserve months of due process. Such a level of due process is, apparently, reserved for their well-heeled clients, but not for us.

Denying relief even for **plain errors** where a defendant deliberately provokes a procedural irregularity; such as here; the **invited error doctrine** seeks to avoid **rewarding mistakes** stemming from a defendant's own "intelligent, deliberate course of conduct" in pursuing his defense. *Ferguson v. United States*, 758 F.2d 843, 852 (2d Cir.1985); cf. *United States v. Coonan,* 938 F.2d 1553, 1561 (2d Cir.1991) (refusing to review appellate claims "attempting to evade the consequences of an unsuccessful tactical decision"). In this instance, the Preferred Series B Holders were/are represented by sophisticated counsel, who are among some of the best law firms in the world, so they should know better. They are not like unsophisticated, (mostly) unrepresented/self represented, retail investors (who are actual parties to the TOS, unlike the Series B Preferred Holders). They *cannot* claim to not have known better, because they either did, or they *should* have known better, since it's literally their job to know better.


Here, if the Series B Preferred holders had wanted customers to ***actually represent themselves*** in litigation over which entities customers had contract claims against which Celsius entities, they would not have proposed, supported, and agreed to a briefing schedule where the UCC, the Debtors, and the Series B Preferred Holders were the only ***required*** participants, where everyone else was ***optional,*** and where there was a mere nine days to file a brief from the entry of the

13

briefing schedule order (*far* less than 21 days for a bar date, for example). And they also would not have expressly contended in a Bankruptcy Court filing that such a process, which arguably was designed to prevent/limit customer participation, protected due process for "***all parties***." (Emphasis added.)


The bottom line is that earlier in the case—when it ***benefited*** the Series B Preferred Holders to have the UCC and the Debtors "represent" customers in litigation around the question of which entities customers had claims, they rushed the Customer Contract Claims decision forward. In doing so, they accepted that the UCC and the Debtors would ***almost certainly*** be the only parties arguing on behalf of customers in the matter. (In the alternative, they accepted participating in litigation where, by the arguments they make now, no participating party to the litigation had standing to represent customers; and the only parties to the terms of use—customers—were therefore entirely unrepresented in the matter—and it was akin to a default judgment. If so, they can state in their reply that they believe no customers were represented in the Customer Contract Claims matter, and that, rather, it was akin to a default judgment.)

If the Series B Preferred Holders **do** contend that the UCC and/or the Debtors represented customers in the Customer Contract Claims issue and protected the due process interests of customers at that time, they can't have it both ways now (as they seem to want to have it) and claim that the UCC cannot represent customers now. They cannot first **actively work to exclude** customers from participating in litigation which designed to effect which entities they have claims against, while claiming that the UCC (and the Debtors) represent them in that instance and that due process is **protected** for all parties—and then turn around and argue that the UCC cannot represent customers in the next phase of the litigation—under some phantom rights they are suddenly asserting on behalf of non-existent customers who purportedly want to litigate their own non-contract claims.[16]

The bottom line is that the Series B Preferred Holders **expressly supported** litigation earlier in the case where either the UCC represented customers or else, they must admit, no one represented customers. They must not now be permitted to

---

[16] We contend the Customer Contract Claims order (the subject of the **other** appeal in the District Court) is void with respect to most customers, because of lack of service to approximately 600,000 customers, due to an error by the Debtors, and other causes of action on appeal and under a potential future Rule 60 motion. However, if you asked the Series B Preferred Holders, they would certainly argue that the Customer Contract Claims order is "law of the case." And, the invited error is binding on the Series B Preferred Holders because they invited the litigation and participated in it. All rights reserved.

appeal regarding the UCC's representation of customers in another matter now,

merely because it suits their interests.

**The Series B Holders Consented to the UCC and Debtors Representing Customers on the Customer Contract Claims Issue; Their Consent is Both Invited Error and Law of the Case**

No parties dispute that the Customer Contract Claims order is a final order.

(This is distinct from the *Memorandum Opinion and Order, Signed on 1/4/2023,*

*Regarding Ownership of Earn Account Assets* [Bkr. Dkt. No. 1822], which The

Honorable J. Paul Oetken has ruled is an ***interlocutory*** order which is subject to

reconsideration ***at any time***.) *See Order of U.S. District Court Judge* [Bkr Dkt. No.

2320].)

With respect to final orders such as this one, the law of the case doctrine

incorporates invited error from the Series B Preferred Holders. The Law of the

Case doctrine provides that "when a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case."

*Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7–8 (2d Cir. 1996) (quoting

*DiLaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1991)); see also *In re PCH*

*Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) ("Under the law of the case doctrine, a

decision on an issue of law made at one stage of a case becomes binding precedent

to be followed in subsequent stages of the same litigation."). Here, the Series B

Preferred Holders' **consented** to the UCC and the Debtors' representing customers'
interests, in the Customer Contract Claims process (also known as the "Briefed
Legal Issue" process). This consent became law of the case with respect to the
Series B Preferred Holders, as active parties to the litigation who invited that
interpretation at that time and are now bound by it going forward; the issue cannot
be reopened by them now.[17]

The law of the case doctrine is informed "by considerations of fairness to the
parties, judicial economy, and the societal interest in finality." *United States v.
Carr*, 557 F.3d 93, 102 (2d Cir. 2009); *see also In rePCH Assocs.*, 949 F.2d at 592.
Courts apply the law of the case doctrine "when the[] prior decisions in an ongoing
case either expressly resolved an issue or **necessarily resolved it by implication**."
(Emphasis added) *See also Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d
Cir. 2001). Absent "compelling reasons counsel[ing] otherwise," "a court should
adhere to its earlier decisions in subsequent stages of litigation." *In re Motors
Liquidation Co.*, 585 B.R. 708, 725 (Bankr. S.D.N.Y. 2018) (Glenn, J.) (quoting

---

[17] We reserve the right to file a Rule 60(b) Motion in the Bankruptcy Court and raise in our appeal the lack of representation on Customer Contract Claims; unlike the Series B Preferred Holders, we did not waive the right to participate, nor did we invite this error, nor did we approve this scheduling order. On the other hand, the Series B Preferred Holders **strongly and explicitly** invited the error (if it was an error) of moving forward on the Customer Contract Claims / Briefed Legal Issue without any representation for customers except for the UCC. The proposition that customers do not need to be directly present to litigate regarding customer matters became law of the case for the Preferred Series B Holders with respect to all subsequent litigation after the Customer Contract Claims litigation. They cannot pick and choose in which matters customers get direct representation, and in which they get none.

*Tomasino v. Estee Lauder Cos., Inc.*, 2015 WL 1470177, at *1 (E.D.N.Y. Mar. 31, 2015)). 28.

Here, the Series B Preferred Holders' claims fall directly within the ambit of the Customer Contract Claims Briefing Schedule *they* proposed, *they* promoted, and *they* litigated under, which required only the UCC, the Debtors, and the Series B Preferred Holders to participate in the litigation. The Series B Preferred Holders supported litigation on an expedited timeline where no customers were required to be present, in order to: "enable these cases to move forward expeditiously while safeguarding all parties' due process rights."[18] While *we* may take issue with *their* stance at that time, and reserve all rights (because customers such as ourselves did not have notice and a meaningful opportunity to participate in the Customer Contract Claims / Briefed Legal Issue litigation), the Series B Preferred Holders *expressly supported* it and can make no such arguments now—nor can they complain about the UCC representing customers on other matters now. Rather, they invited this exact error with forethought and waived this exact issue, *when and where it benefited them*. If there is error in the UCC representing customers, it is both invited and it is now law of the case, with respect to the Series B Preferred Holders, and it is binding on them. They cannot have it both ways.

---

[18] See *Series B Preferred Holders' Statement (A) in Support of Debtors' Motion Seeking Entry of an Order (I) Setting a Briefing Schedule and (II) Granting Related Relief and (B) in Response to the Committee's Objection*, Bkr. Dkt. No. 1631

## **CONCLUSION**

Under the long established legal doctrines of "be careful what you wish for, because you just might get it," and "no take backsies" (as outlined more formally above), and for the reasons outlined by the UCC (in Exhibit A), which we incorporate fully herein, we respectfully request that the Court dismiss the appeal. (*See also* Exhibit B for a relevant internet meme.)

In addition to the aforementioned reasons, this appeal should also be dismissed because it is a waste of limited resources, and it is a shakedown to force a settlement using the funds of retail investors to well-heeled hedge funds where none is likely due (the Series B Preferred Holders may well get nothing, as Chief Judge Glenn has stated multiple times in Court and in his decisions.)[19] While the lawyers arguing on behalf of the Series B Preferred Holders are quite talented, the case itself is laughably weak. These are equity holders fighting a piece of a company that is "hopelessly insolvent." It is time to stop this frivolous litigation in its tracks.

---

[19] Just two examples: "In short, while the Series B Preferred Holders prevail here, they may very well end up recovering nothing." *See Order Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use,* Bkr. Dkt. 2205. "Whether the Customer [Contract] Claims Order [the subject of the other appeal] is affirmed or reversed may make absolutely no difference to the Creditors' recoveries." (Because of non-contract claims, which may well subsume everything, which is the issue before this Court.) *See Order Denying Motion of Daniel A. Frishberg and Immanuel J. Herrmann for Stay Pending Appeal of Order Determining Which Entities Have Liability for Customer Claims*, Bkr. Dkt. 2663.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the type-volume limit of Federal Rule of Bankruptcy Procedure 8013(f)(3)(A) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains less than 5,200 words. This document complies with the typeface and type-style requirements of Federal Rule of Bankruptcy Procedure 8013(f)(2) because this document has been prepared in proportionally spaced typeface using Google Docs in 14-point Times New Roman font.

Respectfully submitted,

Daniel Frishberg, *Pro Se*            Immanuel Herrmann, *Pro Se*
June 5, 2023                          June 5, 2023
/s/*Daniel A. Frishberg*             /s/*Immanuel Herrmann*
Santa Clara County, California       Silver Spring, Maryland

# EXHIBIT A: UCC MOTION INCORPORATED BY REFERENCE

## CASE NO. 1:23-CV-03920-JHR

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

---

IN RE CELSIUS NETWORK LLC, ET AL.,
*DEBTORS.*

---

COMMUNITY FIRST PARTNERS, LLC, ET AL.,

APPELLANT,

V.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR
CELSIUS NETWORK LLC, ET AL.,

APPELLEES.

---

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
BANKR. CASE NO. 22-10964 (MG)

---

## APPELLEE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## MOTION TO DISMISS THIS APPEAL

---

May 30, 2023

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, NY 10020

Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com
        jweedman@whitecase.com

Michael C. Andolina (*pro hac vice* forthcoming)
Gregory F. Pesce (*pro hac vice* forthcoming)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
        gregory.pesce@whitecase.com

Keith H. Wofford
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

Aaron E. Colodny (*pro hac vice* forthcoming)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of
Unsecured Creditors*

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ............................................................................................4

    A.    The Chapter 11 Cases..........................................................................4

    B.    The Customer Claims Order ................................................................5

    C.    The Class Claim Motion and Class Claim Order.................................6

ARGUMENT ................................................................................................10

I.     THE CLASS CLAIM ORDER IS NOT A FINAL ORDER ......................10

II.    THE CLASS CLAIM ORDER IS NOT SUBJECT TO INTERLOCUTORY REVIEW ....................................................................11

III.   APPELLANTS LACK STANDING TO APPEAL ....................................16

    A.    Appellants Are Not Aggrieved Persons ............................................16

    B.    Appellants Improperly Assert the Rights of Third Parties.................20

CONCLUSION ..............................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re AMR Corp.*,
2022 WL 1556398 (S.D.N.Y. May 16, 2022) ....................................................18

*In re Barnet*,
737 F.3d 238 (2d Cir. 2013) ....................................................3, 16, 17

*In re Bernard L. Madoff Inv. Securities LLC*,
721 F.3d 54 (2d Cir. 2013) ....................................................4

*In re Celsius Network LLC*,
2023 WL 2648169 (S.D.N.Y. Mar. 27, 2023)................................................2, 12

*In re Celsius Network LLC*,
645 B.R. 165 (Bankr. S.D.N.Y. 2022)................................................3, 18

*In re Celsius Network LLC*,
649 B.R. 87 (Bankr. S.D.N.Y. 2023)........................................................5, 6, 19

*Chateaugay Corp. v. Iles*,
930 F.2d 245 (2d Cir. 1991) ............................................................10, 11

*In re China Med. Techs., Inc.*,
2013 WL 6667789 (S.D.N.Y. Dec. 17, 2013)..............................................14, 16

*In re Cross Media Mktg. Corp.*,
2007 WL 2743577 (S.D.N.Y. Sept. 19, 2007) ....................................................14

*In re DBSD N. Am., Inc.*,
634 F.3d 79 (2d Cir. 2011) ................................................................17

*Freeman v. J. Reg. Co.*,
452 B.R. 367 (S.D.N.Y. 2010) ....................................................18, 20

*In re Gucci*,
126 F.3d 380 (2d Cir. 1997) ....................................................16, 17

*In re Integrated Res., Inc.*,
3 F.3d 49 (2d Cir. 1993) ............................................................10, 11

# TABLE OF AUTHORITIES

*In re Johns-Manville, Corp.*,
843 F.2d 636 (2d Cir. 1988) ...........................................16, 17, 20, 21

*In re Liddle & Robinson, LLP*,
2020 WL 4194542 (S.D.N.Y. July 21, 2020)...............................12, 13

*In re Major Model Mgt. Inc.*,
641 B.R. 302 (Bankr. S.D.N.Y. 2022).................................................15

*In re Musicland Holding Corp.*,
362 B.R. 644 (Bankr. S.D.N.Y. 2007).....................................14, 15, 16

*In re Ocean Rig UDW Inc.*,
585 B.R. 31 (S.D.N.Y. 2018) ................................................17, 18, 19

*In re Old Mkt. Group Holdings Corp.*,
2023 WL 2207667 (S.D.N.Y. Feb. 24, 2023) ...........12, 13, 14, 15, 16

*In re Perry H. Koplik & Sons, Inc.*,
377 B.R. 69 (S.D.N.Y. 2007) ......................................................13, 16

*Picard v. Est. of Madoff*,
464 B.R. 578 (S.D.N.Y. 2011) ..........................................................12

*In re Platinum Partners Value Arbitrage Fund L.P.*,
2022 WL 4357548 (S.D.N.Y. Sept. 19, 2022) ...................................12

*Rajamin v. Deutsche Bank Nat. Tr. Co.*,
757 F.3d 79 (2d Cir. 2014) ...............................................................20

*Ritzen Group, Inc. v. Jackson Masonry, LLC*,
140 S. Ct. 582 (2020)................................................................1, 2, 10

## STATUTES AND RULES

11 U.S.C. § 1103 .................................................................................21

28 U.S.C. § 158 ........................................................................1, 10, 11

28 U.S.C. § 1292(b) ...................................... 2, 3, 11, 12, 13, 15, 16

Fed. R. Bankr. P. 3001 .......................................................................21

# TABLE OF AUTHORITIES

Fed. R. Bankr. P. 9014(c) ...................................................................1, 9

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases of Celsius Network LLC and its affiliated debtors (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**Celsius**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") respectfully moves to dismiss this appeal.[1]

## PRELIMINARY STATEMENT

This appeal seeks to reverse the Bankruptcy Court's order permitting the Committee to file a class claim pursuant to Federal Rule of Bankruptcy Procedure 9014(c) asserting non-contract claims against certain of the Debtors on behalf of all account holders. The Committee has now filed that claim and a motion to certify the class under Federal Rule of Bankruptcy Procedure 7023, which incorporates Federal Rule of Civil Procedure 23 by reference.

This appeal by the Debtors' equity holders should be dismissed for at least three reasons. ***First**,* the Class Claim Order[2] is not a final order that Appellants may appeal as of right under 28 U.S.C. § 158(a)(1).[3] "Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching

---

[1] "Dkt. " refers to the docket in this appeal, and "Bankr. Dkt." refers to the docket in Case No. 22-10964 (MG) (Bankr. S.D.N.Y.).

[2] *Order Granting the Committee's Class Claim Motion* [Bankr. Dkt. 2496].

[3] Despite the plainly interlocutory nature of the Class Claim Order, Appellants failed to seek leave to appeal. *See* 28 U.S.C. § 158(a)(3) (providing that parties may only appeal interlocutory orders "with leave of the court").

bankruptcy case." *Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020). The Class Claim Order does no such thing. The Class Claim Order authorized the Committee only to *file* a class claim. That's it. Appellants have not filed their objection to the class claim. The Bankruptcy Court has not ruled on the class claim. The Bankruptcy Court has not even certified a class. In other words, several potentially dispositive events remain pending in the Bankruptcy Court that may moot this appeal before this Court has a chance to rule on it. Accordingly, the Class Claim Order does not "definitively dispose of" any dispute in the Bankruptcy Court and is not a final order subject to immediate appeal. *Id.*

**Second**, the Class Claim Order is not suitable for interlocutory appeal. This Court may, in its discretion, accept an appeal from an interlocutory bankruptcy court order when all three factors identified in 28 U.S.C. § 1292(b) are present. But none of those factors exists here, much less all three. First, "an immediate appeal from the order" would not "materially advance the ultimate termination" of the litigation over account holders' non-contract claims. 28 U.S.C. § 1292(b). Those claims exist and will be brought (and litigated) regardless of whether the Bankruptcy Court permitted the Committee to bring them as a class claim. The Bankruptcy Court's order simply authorized the first step in how those claims may be asserted. Second, there is no "substantial ground for difference of opinion" regarding the order. *Id.* A "substantial ground for difference of opinion" exists where there is a

question about whether the Bankruptcy Court applied the proper legal standard. Here, there is no doubt the Bankruptcy Court correctly applied controlling Second Circuit precedent in entering the Class Claim Order. Finally, the Class Claim Order does not "involve[] a controlling question of law" because whether the Committee can file a class claim is not solely a legal question, but rather depends on the unique facts of this case. *Id.* Judge Oetken has already ruled in this case that similar questions are not the proper subject of interlocutory appeals. *In re Celsius Network LLC*, 2023 WL 2648169, at *1-2 (S.D.N.Y. Mar. 27, 2023) (applying section 1292(b) factors and dismissing interlocutory appeal).

**Third**, Appellants lack standing to appeal the Class Claim Order. Appellants are not "person[s] aggrieved" by the Bankruptcy Court's decision to allow the Committee to file a class claim, as is required for bankruptcy appellate standing. *In re Barnet*, 737 F.3d 238, 241-42 (2d Cir. 2013). Appellants likely stand to recover nothing from the Debtors, which are most "likely insolvent" and cannot pay their creditors—much less their shareholders—in full for a number of reasons, including that creditors have non-contract claims against the entity where Appellants made their equity investment. *In re Celsius Network LLC*, 645 B.R. 165, 174 (Bankr. S.D.N.Y. 2022). The ability of the Committee to assert those claims in a collective fashion, if they can meet the applicable requirements, does not directly harm Appellants. Appellants' other arguments that were asserted before the Bankruptcy

Court largely pertain to whether the Committee's filing of the class claim violates the Committee's fiduciary duties to the Debtors' account holders, not Appellants. Appellants do not have third party standing to enforce the rights of other creditors of the Debtors, who did not object to the motion themselves. *In re Bernard L. Madoff Inv. Securities LLC*, 721 F.3d 54, 58 (2d Cir. 2013).

## BACKGROUND

### A.    The Chapter 11 Cases

On July 13, 2022, the Debtors filed chapter 11 cases before the Bankruptcy Court.  The Debtors included Celsius Network Limited ("**CNL**"), which was the indirect parent company of Celsius Network LLC ("**LLC**").  On July 27, 2022, the United States Trustee appointed the Committee, which is composed of seven account holders that transferred digital assets to the Debtors prior to the petition date.

The Debtors attributed their bankruptcy filing to severe losses sustained as a result of "poor asset deployment decisions" and a downturn in the cryptocurrency markets in early to mid-2022.[4]  Investigations by the Bankruptcy Court-appointed examiner and the Committee revealed that to be, at best, misleading.  The Debtors always operated at a deficit, never generated sufficient revenue to pay the rewards they promised to account holders, and failed to operate their business in a safe and

---

[4] *Declaration in Support of Debtors' First Day Motions* [Bankr. Dkt. 23] (the "**First Day Decl.**") ¶ 10.

prudent manner.[5]   In fact, the Debtors engaged in speculative, risky, and unsound investments, which were inconsistent with how the Debtors marketed themselves to account holders and which ultimately decimated the Debtors' liquidity and necessitated their bankruptcy filings.[6]

As of the petition date, the Debtors were hopelessly insolvent, faced a shortfall in customer assets exceeding $1 billion, and could not pay account holders and other creditors in full.[7]   As a result, the Debtors' current proposed plan of reorganization does not propose to pay anything to shareholders, including Appellants.[8]

### B.    The Customer Claims Order

CNL had originally been the only Debtor entity party to the terms of use.  In the late-summer of 2021, as part of an attempt to avoid regulatory action in the United Kingdom, the Debtors changed the entity that was a party to the terms of use from CNL to "Celsius Network LLC and its Affiliates."  *In re Celsius Network LLC*, 649 B.R. 87, 92 (Bankr. S.D.N.Y. 2023) (the "**Customer Claims Order**").

On March 9, 2023, the Bankruptcy Court resolved a dispute about which Debtor entities were liable for contract claims arising from the terms of use.  The Bankruptcy Court held that "only Celsius Network LLC is liable for customer

---

[5] *Final Examiner's Report* [Bankr. Dkt. 1956] at 3-33.

[6] *Id.*

[7] First Day Decl. ¶ 16.

[8] *Plan of Reorganization* [Bankr. Dkt. 2358] (the "**Plan**") Art. III.B.13.

contract claims under the Terms of Use" and "affiliates of LLC [such as CNL] are excluded from contract liability under the Terms of Use."[9]

The Bankruptcy Court's ruling was limited to contract claims.  It explained that "the Terms of Use do not limit Customers (or the Committee) from asserting non-contract claims against CNL, or against other Debtor or non-Debtor affiliates, such as claims for fraud, negligent misrepresentation, or other statutory or common law claims."  *In re Celsius Network LLC*, 649 B.R. at 91.

### C.    The Class Claim Motion and Class Claim Order

Following the Customer Claims Order, the Committee filed a motion seeking authority to file a class proof of claim on behalf of all customers, asserting statutory and common law non-contract claims against CNL and other Debtor entities, including claims for fraudulent and negligent misrepresentation.[10]  The vast majority of the Debtors' customers are retail investors, many of whom do not live in the United States.  It would be infeasible and burdensome on the Debtors and the Bankruptcy Court—and would impose substantial litigation costs—to require every account holder to file individual claims.[11]  It is also unnecessary because all account holders have common non-contract claims based on the Debtors' prepetition

---

[9] *Order Regarding Which Debtor Entities Have Liability For Customer Contract Claims Under the Terms of Use* [Bankr. Dkt. 2265] ¶ 1.

[10] *Motion of the Official Committee of Unsecured Creditors for Authority to File a Class Claim* [Bankr. Dkt. 2399].

[11] *Id.* ¶¶ 1-7, 26-29.

misconduct.[12]  Many account holders (who are largely *pro se*) also lack resources to file well-pleaded and particularized non-contract claims by the claims bar date, which could result in the forfeiture of otherwise viable claims and unequal recoveries favoring the limited number of account holders able to timely file claims.[13]

Account holders and the Debtors supported the Committee's motion.  For instance, Ignat Tuganov, an account holder of the Debtors (who is now acting as a class representative), filed a response stating that he did "not object to the filing of an appropriate class claim on behalf of all account holders to protect customers and to avoid the administrative burden and attendant costs and delay of potentially tens or hundreds of thousands of additional proofs of claim being filed."[14]  Additional account holders, including Rebecca Gallagher (who is now acting as a class representative), noted that "bringing non-contract claims—such as those for fraudulent inducement, fraudulent misrepresentation, the violation of consumer protection laws, and more, one customer at a time—was a daunting prospect," and that they were "supportive of the [Committee's] collective process to enable

---

[12] *Id.* ¶¶ 1-7, 27, 38.

[13] *Id.* ¶ 27.

[14] *Ignat Tuganov's Response to the Committee's Class Claim Motion* [Bankr. Dkt. 2474] ¶ 17.  Mr. Tuganov requested modifications to the Committee's proposed order granting the class claim motion, including preserving account holders' rights to opt-out of the class and any settlement. The Committee incorporated Mr. Tuganov's requested revisions in the form of order the Bankruptcy Court approved.

customers to assert non-contract claims against [CNL] and other affiliates."[15]  No account holder objected to the motion.  In addition, the Debtors—the defendants to any non-contract claims—did not object to the filing of a class claim, but rather acknowledged that a collective process was necessary.[16]

In the face of unanimous creditor and Debtor support for the motion, Appellants objected.  They claimed to be protecting the interests of account holders and argued that the Committee had conflicts of interest precluding it from representing the class, that it could not adequately represent the class, and that it lacked standing under the Bankruptcy Code to file a class claim.[17]  They also argued that the factors governing the use of class claims in bankruptcy did not favor allowing the Committee to file the class claim and that the Committee would be unable to certify the class under Rule 23.[18]

On April 18, 2023, the Bankruptcy Court overruled Appellants' objection and entered the Class Claim Order, authorizing the Committee to file a class claim.[19]

---

[15] *Immanuel Herrmann, Daniel Frishberg, and Rebecca Gallagher's Response to the Committee's Class Claim Motion* [Bankr. Dkt. 2476] at 1.

[16] Apr. 18, 2023 Hr'g Tr. [Bankr. Dkt. 2576-B] (the "**Hr'g Tr.**") at 81:17-82:2 (explaining that, while the Debtors reserved rights to review the class claim that is filed, the Debtors "do believe that the [class claim] process that the Committee is proposing is very reasonable and frankly will aid efficiency").

[17] *Series B Preferred Holders' Objection to the Committee's Class Claim Motion* [Bankr. Dkt. 2467] (the "**Preferred Shareholder Obj.**") ¶¶ 7-10, 25-27, 32-38.

[18] *Id.* ¶¶ 11-31.

[19] Class Claim Order ¶ 3.

The Bankruptcy Court explained that Bankruptcy Rule 9014(c) grants bankruptcy courts the "discretion" to allow class proofs of claim in appropriate cases.[20]  The Bankruptcy Court then found that "equitable considerations weigh strongly in favor of granting this motion."[21]   It specifically noted that "[d]enying the motion is likely to result in only the sophisticated and represent[ed] claimants submitting their claims prior to the amended bar date to the detriment of the great majority of creditors.  That outcome goes against the fundamental tenet of bankruptcy, which is a fair and equitable distribution of assets to creditors."[22]   Finally, the Bankruptcy Court highlighted that Appellants' objection was "premature," as they could "litigate strenuously whether the class should be certified" after the class claim is filed.[23]

On April 28, 2023, the Committee filed the class claim on behalf of Mr. Tuganov, Ms. Gallagher, and Thomas DiFiore, the co-chair of the Committee, in their individual and representative capacities.[24]  On May 17, 2023, the Committee filed a motion seeking certification of the class claim under Rule 23.[25]   The Bankruptcy Court has not yet ruled on the Committee's class certification motion.

---

[20] Hr'g Tr. at 84:1-14.

[21] *Id.* at 85:15-86:15

[22] *Id.*

[23] *Id.* at 86:16-19.

[24] *Notice of Filing of Class Proof of Claim* [Bankr. Dkt. 2556].

[25] *Motion of the Official Committee of Unsecured Creditors to Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors* [Bankr. Dkt. 2670].

Class certification and merits-based discovery and litigation are in their early stages in the Bankruptcy Court.

## ARGUMENT

This appeal should be dismissed on at least three grounds: (1) the Class Claim Order is not a final order appealable as of right; (2) discretionary, interlocutory review of the Class Claim Order is inappropriate on the facts and circumstances here; and (3) Appellants lack standing to appeal.

## I.  THE CLASS CLAIM ORDER IS NOT A FINAL ORDER

Appellants cannot appeal the Class Claim Order as of right because it is not a final order within the meaning of 28 U.S.C. § 158.  District courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" and "with leave of the court, from other interlocutory orders and decrees."  28 U.S.C. § 158(a).  "Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case." *Ritzen Group*, 140 S. Ct. at 586. In other words, an order "must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief," to be a final order.  *In re Integrated Res*., *Inc*., 3 F.3d 49, 53 (2d Cir. 1993).  "An order allowing a class proof of claim to be filed is not a final order within the meaning of section 158(d)." *Chateaugay Corp. v. Iles*, 930 F.2d 245, 248 & n.2 (2d Cir. 1991) (recognizing that

an order allowing a class claim to be filed did not "finally determine[] the question whether the Claimants may proceed as a class").

The Class Claim Order is not a final order. As in *Chateaugay*, the Class Claim Order only "allow[ed] a class proof of claim to be filed." *Id.* It did nothing more. It left decisions on class certification and the merits of the claim to be adjudicated at a later date, after appropriate discovery, briefing, and evidentiary presentations by all interested parties, including Appellants. Litigation over class certification is in its early stages in the Bankruptcy Court, and litigation on the merits of the class claim has not even started. Because the Class Claim Order leaves these substantial issues open, it does not "completely resolve all of the issues pertaining to [the class claim], including issues as to the proper relief," and is not a final order appealable as of right. *Integrated Res.*, 3 F.3d at 53.

## II. THE CLASS CLAIM ORDER IS NOT SUBJECT TO INTERLOCUTORY REVIEW

Appellants did not seek leave to appeal the interlocutory Class Claim Order; however, even if they did, such appeal would not be proper. Under 28 U.S.C. § 158(a)(3), this Court has discretion to exercise jurisdiction over appeals from "interlocutory orders and decrees" issued by a bankruptcy court. When considering whether to grant leave to appeal in bankruptcy cases, courts apply the standard set forth in 28 U.S.C. § 1292(b), which asks whether the order "(1) involves a controlling question of law (2) over which there is a substantial ground for difference

of opinion and (3) if an immediate appeal would materially advance the ultimate termination of the litigation." *In re Celsius Network LLC*, 2023 WL 2648169, at *1 (discussing section 1292(b) factors and dismissing interlocutory appeal). "All three requirements set forth in section 1292(b) must be met for a Court to grant leave to appeal." *In re Old Mkt. Group Holdings Corp.*, 2023 WL 2207667, at *4 (S.D.N.Y. Feb. 24, 2023).

Appellants face a "high bar" to proceed with an interlocutory appeal. *Id.* at *1. "[E]ven if the three criteria [in section 1292(b) are] met, the court retains the discretion to determine whether leave to appeal is warranted." *In re Platinum Partners Value Arbitrage Fund L.P.*, 2022 WL 4357548, at *3 (S.D.N.Y. Sept. 19, 2022). "[L]eave to appeal from interlocutory orders should be granted only in exceptional circumstances that overcome the general aversion to piecemeal litigation and justify departing from the basic policy of postponing appellate review until after the entry of a final judgment." *Picard v. Est. of Madoff*, 464 B.R. 578, 582 (S.D.N.Y. 2011). Accordingly, district courts must exercise "great care" before finding that a party cleared the high bar for leave to file an interlocutory appeal. *Platinum Partners Value Arbitrage Fund*, 2022 WL 4357548, at *3.

The Court should not permit Appellants to proceed with an interlocutory appeal. ***First***, an immediate appeal from the Class Claim Order will not advance the ultimate termination of the litigation. This factor primarily concerns judicial

efficiency and "is considered the most important of the section 1292(b) factors." *In re Liddle & Robinson, LLP*, 2020 WL 4194542, at *5 (S.D.N.Y. July 21, 2020).  An immediate appeal is considered to advance the ultimate termination of the litigation if that "appeal promises to advance the time for trial or to shorten the time required for trial."  *In re Perry H. Koplik & Sons, Inc.*, 377 B.R. 69, 74 (S.D.N.Y. 2007).  An appeal does not advance the termination of litigation if the appeal's disposition "simply invite[s] further litigation" among the parties.  *Old Mkt. Group Holdings*, 2023 WL 2207667, at *6.

Here, an interlocutory appeal will not promote judicial efficiency or advance the ultimate termination of the litigation over account holders' non-contract claims. The Class Claim Order did not resolve any questions on the merits of account holders' non-contract claims.  Instead, it only addressed a procedural question: should the Committee be permitted to seek class certification of account holders' non-contract claims, or should another party be permitted to file the class claim or all 600,000 account holders be forced to individually file common non-contract claims?  Regardless of the outcome of this appeal, litigation over the merits of account holders' non-contract claims will need to occur.  And a decision by this Court reversing the Class Claim Order would "simply invite further litigation" among the parties because it would result in either another party asserting the class claim or the disaggregation of the class claim into as many as 600,000 individual

actions.  *Id.*  That outcome would only delay a final adjudication of account holders'

non-contract claims and would not advance the termination of the litigation.

**Second**, there is no substantial ground for difference of opinion regarding the

Class Claim Order.  "A substantial ground for a difference of opinion exists where

there is genuine doubt as to the correct applicable legal standard relied on in the

order."  *Old Mkt. Group Holdings*, 2023 WL 2207667, at *5.  "Genuine doubt" as

to the appropriate legal standard is present where "(1) there is conflicting authority

on the issue, or (2) the issue is particularly difficult and of first impression" for the

Second Circuit.  *In re China Med. Techs., Inc.*, 2013 WL 6667789, at *11 (S.D.N.Y.

Dec. 17, 2013).  "Merely claiming that the bankruptcy court's decision was incorrect

is insufficient to establish substantial ground for difference of opinion."  *In re Cross

Media Mktg. Corp.*, 2007 WL 2743577, at *2 (S.D.N.Y. Sept. 19, 2007).

Here, no substantial ground for difference of opinion exists because the

Bankruptcy Court applied the correct legal standard.  The question of whether

bankruptcy courts should permit the filing of a class claim is not novel in the Second

Circuit, and there is no conflicting authority on the issue in this circuit.  The

Bankruptcy Court cited the leading authority on this topic in the Second Circuit—*In*

*re Musicland Holding Corp.*, 362 B.R. 644 (Bankr. S.D.N.Y. 2007).[26]   Appellants

agree that this is the controlling standard.[27]

    *Musicland* explained that the decision whether to permit a class proof of claim

is "committed to the court's discretion" and informed by three factors: whether the

class claim will unduly delay administration of the case, whether a class was certified

prepetition, and whether claimants received notice of the deadline to file bankruptcy

claims. *Id.* at 650, 654-55. *Musicland* has been consistently followed by courts in

the Second Circuit in the more than 15 years since it was published. *See, e.g.*, *In re

Major Model Mgt. Inc.*, 641 B.R. 302, 320 (Bankr. S.D.N.Y. 2022) (applying

*Musicland* factors).  And the Bankruptcy Court faithfully applied it here, explaining

why each of the *Musicland* factors supported allowing the Committee to file the class

claim.[28]   There is no substantial ground for a difference of opinion about the legal

standard that the Bankruptcy Court applied in entering the Class Claim Order, and

the Bankruptcy Court applied it correctly.

    **Third**, the Class Claim Order does not involve any controlling question of

law.  For purposes of an interlocutory appeal under 28 U.S.C. § 1292(b), a "question

of law" must "be a pure question of law that can be decided quickly and cleanly

---

[26] Hr'g Tr. at 84:1-86:15.

[27] *Appellants' Statement of Issues on Appeal* [Bankr. Dkt. 2651] ("**Appellants' Statement of Issues**") at 12 (citing "the *Musicland* factors").

[28] Hr'g Tr. at 84:1-86:15.

without detailed study of the record." *In re Old Mkt. Group Holdings*, 2023 WL 2207667, at *4. "Questions regarding application of the appropriate law to the relevant facts are generally not suitable for certification under section 1292(b)." *Perry*, 377 B.R. at 74.

But, here, the dispositive question in this appeal is whether the Bankruptcy Court abused its discretion applying the *Musicland* factors to authorize the filing of a class claim. *Musicland*, 362 B.R. at 654. The Bankruptcy Court made a series of discretionary, fact-bound decisions that the *Musicland* factors supported the use of a class claim.[29] To review those decisions, this Court will have to take a "detailed study of the record" and the unique facts of this case, rather than review any pure questions of law. *China Med. Techs.*, 2013 WL 6667789 at *10. The interlocutory appeal factors therefore do not support permitting this appeal to proceed.

## III.   APPELLANTS LACK STANDING TO APPEAL

### A.   Appellants Are Not Aggrieved Persons

Under long-established Second Circuit law, a party to a bankruptcy case can appeal a bankruptcy court's order "only if the order directly affects his pecuniary interests." *In re Johns-Manville, Corp.*, 843 F.2d 636, 642 (2d Cir. 1988); *accord In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997). Mere "potential harm" from a bankruptcy court order is "insufficient to justify appellate standing." *Barnet*, 737

---

[29] *Id.*

16

F.3d at 243.  Instead, an appellant must show that its injury is both "'direct' and 'financial.'"  *In re DBSD N. Am., Inc.*, 634 F.3d 79, 89 (2d Cir. 2011).

The "aggrieved person" test is "stricter" than Article III standing rules that govern non-bankruptcy civil litigation: an "injury-in-fact" is sufficient for Article III standing but not for "aggrieved person" standing.  *Gucci*, 126 F.3d at 388.  As a result, not every party in interest with a right to be heard in the bankruptcy court has standing to prosecute an appeal.  *Barnet*, 737 F.3d at 242.  Otherwise, "marginal parties," *Johns-Manville Corp.*, 843 F.2d at 642 n.3, could mire bankruptcy cases in "endless appeals," *Barnet*, 737 F.3d at 243, and "sound the death knell of the orderly disposition of bankruptcy matters." *Gucci*, 126 F.3d at 388.

Pursuant to the "aggrieved person" standard, appellate courts regularly dismiss shareholders' appeals from bankruptcy court orders in cases where a debtor will not be able to pay its creditors in full, much less make any distributions to shareholders.  For instance, in *In re Ocean Rig UDW Inc.*, the district court dismissed a shareholder's appeal from a bankruptcy order after finding that the debtor "was insolvent."  585 B.R. 31, 37–38 (S.D.N.Y. 2018).  It explained that, because of the debtor's insolvency, the estate's "total value . . . would go to [its] creditors *pro rata*, with no value left for its pre-restructuring shareholders." *Id.*  As a result, the appellant, "as a purported shareholder, did not stand to lose anything from, and thus had no pecuniary interest in, [the debtor's] restructuring" and lacked standing to

appeal.  *Id.*  The Second Circuit affirmed.  764 Fed. App'x 46, 48 (2d Cir. 2019) (affirming order dismissing appeal because appellant did not "show that, as a shareholder, she has a pecuniary interest in the reorganization of the insolvent Cayman Islands corporation"); *accord In re AMR Corp.*, 2022 WL 1556398, at *6 (S.D.N.Y. May 16, 2022), *aff'd*, 2023 WL 2770228 (2d Cir. Apr. 4, 2023) (dismissing shareholder's appeal because shareholder could not explain how the appealed order would "have an adverse effect on the final distributions on equity payouts to shareholders"); *Freeman v. J. Reg. Co.*, 452 B.R. 367, 371 (S.D.N.Y. 2010) (dismissing shareholder's appeal and noting, "here where various classes of creditors received less than their full recoveries, the appellant, as an equity holder, has no basis for recovery and, accordingly, no pecuniary interest at stake").

Appellants are not aggrieved persons entitled to appeal the Class Claim Order because the order does not directly and financially injure them.  As the Bankruptcy Court has noted, the Debtors are "likely insolvent."  *Celsius Network*, 645 B.R. at 174.  The Debtors' liabilities to account holders and other creditors exceed their assets by billions of dollars.[30]  As a result, the Debtors' proposed plan of reorganization proposes to pay creditors a fraction of their claims and to pay nothing to shareholders, including Appellants.[31]  Whether the Class Claim Order is affirmed

---

[30] First Day Decl. ¶ 16.
[31] Plan Art. III.B.13.

or reversed will not change that fact.  Accordingly, Appellants do "not stand to lose anything from, and thus ha[ve] no pecuniary interest in" entry of the Class Claim Order.  *Ocean Rig UDW*, 585 B.R. at 38.

Even if the Debtors were not insolvent, Appellants would still lack standing to appeal the Class Claim Order.  The Class Claim Order does not directly or financially impact their rights.  The Class Claim Order simply authorizes the Committee to file the class claim.  The Class Claim Order neither certifies the class, nor adjudicates the merits of the class claim.  Appellants will have a full and fair opportunity to "litigate strenuously" in the Bankruptcy Court over class certification and the class claim's merits.[32]  Appellants might—*potentially*—suffer a direct and financial injury *only if* the Bankruptcy Court determines that the Debtors are solvent and able to pay their creditors in full, and that the class claim should be allowed in an amount exceeding the Debtors' equity value otherwise distributable to Appellants.  But that harm relies on numerous, uncertain rulings that the Bankruptcy Court may issue in the future.  Accordingly, the Bankruptcy Court has noted that, as a result those rulings, Appellants "may very well end up recovering nothing."  *In re Celsius Network LLC*, 649 B.R. at 91.

For these reasons, Appellants are not aggrieved persons with standing to appeal.

---

[32] Hr'g Tr. at 86:16-19.

**B.      Appellants Improperly Assert the Rights of Third Parties**

Appellants cannot avoid dismissal by asserting the rights of third parties—namely, the rights of account holders who uniformly supported entry of the Class Claim Order.  As the Second Circuit has explained, longstanding principles of third-party standing preclude a litigant from appealing a bankruptcy order "based on the rights of third parties who apparently favor" the appealed order.  *Johns-Manville Corp.*, 843 F.2d at 644; *see also Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (explaining that prudential standing rules "bar[] litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves").  To be heard on appeal, a party to a bankruptcy case must "assert his own legal rights and interests," not those of others.  *Freeman*, 452 B.R. at 371.

As they did in the Bankruptcy Court, Appellants oppose the Class Claim Order based on account holders' rights.  Appellants' statement of issues on appeal asks whether the Bankruptcy Court erred in allowing the Committee to file the class claim "even though the Committee cannot act on behalf of individual creditors and even though the Committee is not and cannot be a class member."[33]  Appellants raised the same arguments in the Bankruptcy Court.  *See Preferred Shareholder Obj.* ¶ 27 ("[S]erving as a class representative for the account holders is fundamentally at odds with the Committee's fiduciary duties.  The Committee cannot fulfill the

---

[33] Appellants' Statement of Issues at 12.

obligation to fairly and adequately represent the proposed class."); *id.* ¶ 34 ("[T]he Committee is inherently conflicted, and therefore cannot prosecute [the class claim] without breaching its fiduciary duties.").

These issues go to whether the Committee may act as the class representatives' authorized agent under Bankruptcy Rule 3001 to file and prosecute the class claim, and whether the Committee is otherwise authorized under section 1103 of the Bankruptcy Code to act on behalf of all account holders. Yet no account holder complained about the Committee acting on their behalf through the class claim. Appellants lack standing to appeal an order based on allegations that the Committee's actions violate the rights of account holders—***all of whom*** "favor[ed]" entry of the Class Claim Order. *Johns-Manville Corp.*, 843 F.2d at 644.

## CONCLUSION

For the reasons set forth above, the Committee respectfully requests that the Court dismiss the appeal.

Dated:      May 30, 2023
            New York, New York


**WHITE & CASE LLP**

By:      */s/ Samuel P. Hershey*
         David M. Turetsky
         Samuel P. Hershey
         Joshua D. Weedman
         1221 Avenue of the Americas
         New York, NY 10020

Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
        sam.hershey@whitecase.com
        jweedman@whitecase.com

Michael C. Andolina (*pro hac vice* forthcoming)
Gregory F. Pesce (*pro hac vice* forthcoming)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email:  mandolina@whitecase.com
        gregory.pesce@whitecase.com

Keith H. Wofford
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

Aaron E. Colodny (*pro hac vice* forthcoming)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of
Unsecured Creditors*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the type-volume limit of Federal Rule of Bankruptcy Procedure 8013(f)(3)(A) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains less than 5,200 words. This document complies with the typeface and type-style requirements of Federal Rule of Bankruptcy Procedure 8013(f)(2) because this document has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:      May 30, 2023

New York, New York

**WHITE & CASE LLP**

By:      */s/ Samuel P. Hershey*
Samuel P. Hershey

**EXHIBIT B: FIND OUT, F AROUND**



This is an internet meme that is relevant to the Series B Holders' games with so-called "due process" on behalf of non-existent customers' rights. One simple definition, according to the Urban Dictionary is simply "basically just cause and effect but spicier." Another is: "the scientific method." Another source says, simply: "the expression means to stop talking 'garbage' and speak the plain truth."